UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

TASHA MERCEDEZ SHELBY                                        PETITIONER

VERSUS                              CIVIL ACTION NO.1:21-CV-406-HSO-RPM

BURL CAIN, ET AL.                                          RESPONDENTS

## REPORT AND RECOMMENDATIONS

This matter is before the Court for consideration of Tasha Mercedez Shelby's ("Shelby") Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254 on December 21, 2021. Doc. [1]. Shelby, through counsel, amended her petition on March 8, 2022. Doc. [10]. Respondents, Burl Cain, Marc McClure, and Lynn Fitch ("Respondents"), move to dismiss Shelby's petition as untimely. Doc. [16].

I.   BACKGROUND

In June 2000, a jury convicted Shelby of capital felony murder for the death of her two-year-old stepson. The Harrison County Circuit Court sentenced her to life in prison without parole. Doc. [1-20]. She sought direct appeal of her conviction, which was affirmed by the Mississippi Court of Appeals on March 26, 2002. Doc. [16-1]. She did not seek *certiorari* review in either the Mississippi Supreme Court or the United States Supreme Court.

On March 25, 2005, Shelby filed an "Application for Leave to File Motion for Post-Conviction Relief" in the Mississippi Supreme Court. Doc. [1-21]. This was her first post-conviction relief ("PCR") motion. On April 28, 2005, the Mississippi Supreme Court denied her motion after finding she failed to demonstrate ineffective assistance of counsel. Doc. [1-22].

On July 30, 2015, Shelby filed a second PCR motion in the Mississippi Supreme Court. On January 12, 2016, she filed a supplemental motion based on newly discovered evidence. On August

8, 2016, the Mississippi Supreme Court granted her leave to seek PCR in the trial court. Doc. [1-26]. On April 24, 2018, the Harrison County Circuit Court held a PCR evidentiary hearing following discovery and motion hearings. Doc. [10-34]. The trial court denied Shelby's petition for PCR on December 7, 2018. *Id*. Shelby appealed the decision to the Mississippi Court of Appeals. On August 4, 2020, the appellate court affirmed the judgment of the trial court. Doc. [10-37]. Shelby moved for a rehearing of the decision, which was denied on November 17, 2020. Doc. [10-39]. On December 1, 2020, Shelby filed a petition for writ of *certiorari* in the Mississippi Supreme Court. Doc. [10-40]. The Mississippi Supreme Court denied that petition on February 9, 2021. Doc. [10-41].

Shelby filed the instant habeas petition in the United States District Court for the Southern District of Mississippi on December 21, 2021. Doc. [1]. She requests the Court vacate her conviction. She argues that the State relied on the science of Shaken Baby Syndrome ("SBS") at trial to establish Shelby intentionally harmed her stepson, Bryan Thompson IV (known as "Little Bryan"). She asserts that over time the scientific community has rejected SBS. She stresses that the evolution in science demonstrates that her trial was based on "false evidence and her conviction based on false testimony." Doc. [26], at 3. She also presents a claim of actual innocence. Respondents move to dismiss her petition as time-barred under 28 U.S.C. § 2244(d). Doc. [16].

II.  APPLICABLE LAW

a.  Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996, which applies to the current petition, imposes a one-year limitations period on federal habeas petitions filed by state prisoners. 28 U.S.C. § 2244(d)(1). That limitations period begins running from the later of "the date on which the state court judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Or, in dispute here,

2

"the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). "[T]his means the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in [her] possession evidence to support [her] claim." *In re Davila*, 888 F.3d 179, 189 (5th Cir. 2018). The petitioner bears the burden to establish that she exercised due diligence in searching for a factual predicate for her habeas claim. *Allen v. Hancock*, 2011 WL 7461993 at *2 (S.D. Miss. Nov. 9, 2011) (citing *Johnson v. Dretke*, 442 F.3d 901, 908 (5th Cir. 2006)). Section 2244(d)(1)(D) does not "convey a statutory right to an extended delay . . . while a habeas petitioner gathers every possible scrap of evidence that might . . . support [her] claim." *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998); *Osborne v. Hall*, 934 F.3d 428, 431 (5th Cir. 2019).

In limited circumstances, a court may equitably toll the limitations period of § 2244. Equitable tolling is "a discretionary doctrine that turns on the facts and circumstances of a particular case." *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999). Because of the limitations placed on second and successive federal habeas applications, courts are "cautious not to apply the statute of limitations too harshly." *Id*. Nevertheless, equitable tolling is warranted in only "rare and exceptional circumstances." *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998). It is appropriate where the petitioner shows: "(1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010); *Jones v. Lumpkin*, 22 F.4th 486, 490 (5th Cir. 2022).

b.  Actual Innocence

Under the fundamental miscarriage of justice exception, a claim of actual innocence, if proven, allows a first-time federal habeas applicant to overcome the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1). *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). As a threshold matter, a credible gateway claim of actual innocence "requires [the] petitioner to support [her] allegations

of constitutional error with new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "To be credible, [an actual innocence] claim requires [the applicant] to support her allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Tyler v. Davis*, 768 F. App'x 264, 265 (5th Cir. 2019) (quoting *Schlup*, 513 U.S. at 324 (1995)). "[T]enable actual innocence gateway pleas are rare: 'a petitioner does not meet the threshold requirement unless [s]he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find [her] guilty beyond a reasonable doubt.'" *Perkins*, 569 U.S. at 386.

The Supreme Court's decisions addressing actual innocence presuppose that the prisoner has new evidence that did not exist at the time of conviction and sentencing. *Schlup*, 513 U.S. at 316. Evidence does not qualify as "new" under the *Schlup* actual innocence standard if "it was always within the reach of [petitioner's] personal knowledge or reasonable investigation." *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008); *Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018). Even when petitioners assert claims of recanting witnesses and provide affidavits from those witnesses, the affidavits are viewed with "extreme suspicion." *Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005). A convicted criminal defendant must do more than furnish recanting statements from a witness who has given contradictory statements in the past when there exists other evidence tending to corroborate the trial testimony. *Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003). In order to overcome the procedural bar, "the evidence must establish substantial doubt about [the petitioner's] guilt to justify the conclusion that [it] would be a 'miscarriage of justice' to allow [the] Petitioner's conviction to stand." *Schlup*, 513 U.S. at 316; *United States v. Fields*, 761 F.3d 443, 479 (5th Cir. 2014).

III. DISCUSSION

a.  Timeliness

Shelby's capital murder conviction and sentence was final on April 9, 2002, which made her deadline to file a federal habeas petition due on April 9, 2003. Doc. [16-1]. She filed the instant action on December 21, 2021. Doc. [1]. Respondents argue that Shelby's filing is untimely and move to dismiss the petition. Doc. [16]. Shelby contends that she could not have filed her petition after direct appeal because she "could not have established the factual predicate for her claims through the exercise of due diligence until over a decade later." Doc. [26] at 44. She proposes two dates to serve as factual predicate. She argues these dates establish times when she received newly discovered evidence. First, she proposes January 25, 2015, as the date when she received reports from medical experts speaking to the changes in SBS science. She primarily points to the opinion of Dr. Riddick, who was the State's medical expert and forensic pathologist at trial, and later changed his position in 2015. Second, she proposes June 18, 2018, a date when the child's death certificate was amended by Dr. Riddick, who conducted the original autopsy, to rule the cause of death as an accident.

Although Shelby points to these dates in particular, she also broadly argues that the "change in science behind [S]haken baby [S]yndrome is newly discovered evidence" providing a factual predicate. Doc. [26], at 51. She argues that Shelby's conviction is "based on faulty science and false expert testimony." Doc. [26], at 5. The assertion that SBS science is faulty or totally unreliable has been rejected by other courts. *See Giminez v. Ochoa*, 821 F.3d 1136, 1145 (9th Cir. 2016) (finding a "vigorous debate" surrounding the validity of SBS within the scientific community rather than a "repudiation"); *Burns v Wasington*, 2019 WL 3067928, at *5–6 (E.D. Mich. July 12, 2019) (concluding that SBS is not "junk science" but rather a mere controversy

within the medical community that was "a question of credibility, a so-called battle of the experts"); *Foster v. Oregon*, 2012 WL 3776471, \*9 (D. Ore. Mar. 20, 2012) ("this is not a situation where petitioner was convicted based on junk science. Instead. . . where experts forcefully disagree"); *Johnson v. Espinoza*, 2020 WL 1028504 \*15 (S.D. Calif. Mar. 3, 2020) (finding that "far from being 'junk science'" . . . SBS "remains the subject of significant debate among medical professionals"); *Knight v. Shinn*, 2022 WL 3567282, \*7–8 (D.Az July 11, 2022); *Glucksmann v. Eddy*, 2022 WL 17752382, at \*11 (N.D. Ill. Dec. 19, 2022) (concluding that "even if the state courts relied on [S]haken [B]aby [S]yndrome . . . that would not warrant federal habeas relief").

Respondents question the recentness of the change in the science. They assert that the studies questioning SBS were available around the time of Shelby's trial. So, they argue Shelby cannot demonstrate due diligence to establish a timely petition.

The undersigned finds that Shelby has not met her burden to establish the necessary factual predicate. 28 U.S.C. § 2244(d)(1); *Dretke,* 442 F.3d at 908. The record demonstrates that the factual predicate to support her claims may have been available as early as the time of trial in 2000. Dr. Riddick testified at the PCR testimony that SBS had been "in great controversy" for some time, including around the time of trial. Doc. [10-30], at 258–67. He further noted that he "wasn't comfortable with [S]haken [B]aby [S]yndrome itself" at the time of trial. *Id*. at 267. He also testified that "prior to the trial in October 2000, in June and April of 2000 I received a draft of an article . . . indicating to me that there were changes in the opinion of forensic pathologists about short distance falls [and] about the mechanism of the [S]haken [B]aby [S]yndrome. . ." *Id*. at 254. In her petition, Shelby cites at least five medical studies that were published before the time of trial, including a study from 1968. Doc. [110], at 15–16. Thus, around the time of trial, Shelby could have been on notice of the facts which would support her claim. *See In re Davila*, 888 F.3d

179, 189 (5th Cir. 2018); *see also Wright v. Sup. Somerset SCI*, 601 F. App'x 115, 121 (3d Cir. 2015) (finding "at the time of [the petitioner's] trial in July 1998, it was widely understood that shaking alone could cause the injuries . . . [h]owever, this understanding was questionable by the end of 1998"); *Flick v. Warren*, 465 F. App'x 461, 465 (6th Cir. 2012).

Nevertheless, even if the factual predicate was not available at trial, it certainly should have been discovered through due diligence before 2015 or 2018. At the PCR hearing, Shelby's expert discussed the shift in SBS testifying, "[the shift] occurred around the turn of the century, 2001, 2002. . . and this is when the conversations started to really take hold about whether or not this was a safe diagnosis to make." Doc. [10-30], at 44. Additionally, Shelby's petition references scientific studies published from 2001–2012. Doc. [10], at 15–17. In fact, as Respondents highlight, 31 of the 37 medical studies cited are dated before 2015. Doc. [10], at 22–54. Twenty-two of Shelby's scientific references date from 1968–2005, dates well before Shelby sought her federal post-conviction relief. Similarly, Shelby's PCR experts relied on studies published before the factual predicate dates. For example, Dr. Monson discussed a study from 2000 to explain the changes in SBS theories; and Dr. Ophoven relied on articles published from 2001–12. Doc. [10-30], at 441–449. Doc. [16], at 23. The record unequivocally indicates that Shelby through the exercise of due diligence could have discovered the studies undermining the viability of SBS and solicited expert opinions to challenge her confinement long before 2015. Therefore, the undersigned finds that Shelby cannot establish 2015, a date thirteen years after her conviction became final, as a factual predicate. For the same reasons, her 2018 factual predicate fails.

Shelby attempts to account for her delay with various reasons. For instance, Shelby asserts that Hurricane Katrina in 2005 destroyed the pertinent medical records, which made it impossible to gather expert opinions earlier. She also states that she spent 2011–2014 litigating access to the

only known copy of her case file. She argues those actions "demonstrate her due diligence in discovering the ultimate evidence of changed opinions and expert review." Doc. [26], at 48. She contends that she "had no possibility of investigating her own case, contacting medical experts, and determining the exact cause of death for her stepson . . ." *Id*. at 47.

However, she has not presented affidavits or other documentation indicating the unavailability of the expert affidavits and scientific developments. Shelby has not shown what prevented her from pursuing her claim in the years between trial in 2000 and Hurricane Katrina in 2005. The undersigned notes that Shelby waited until 2005 to file her state PCR motion and then another ten years to file her second PCR motion. Shelby does not explain why her efforts were thwarted in the years before she sought access to the file. Shelby's assertions do not justify delaying the commencement of the one-year statute of limitations. Thus, the undersigned recommends that Shelby's petition be found time barred pursuant to § 2244(d). *See Flanagan*, 154 F.3d at 198–99 (5th Cir. 1998) (petitioner is "confusing his knowledge of the factual predicate of his claim with the time permitted for gathering evidence in support of that claim"); *Riley v. Dir., TDCJ-CID*, 2021 WL 5277159, at *5 (N.D. Tex. Feb. 26, 2021) (newly discovered evidence based on an advancement in scientific knowledge did not constitute a new fact "because it recounts studies from years earlier") (citing *Rues v. Denney*, 643 F.3d 618, 622 (8th Cir. 2011) ("It is true that Rues could not have exercised due diligence to discover the study, as the study was not published until 2009, well after Rues' conviction. The study, however, does not constitute a new fact. The study calls into question the validity of methods used to analyze bunter marks on ammunition casings. The study is not the first source to analyze this question."); *Smith v. Davis*, 2020 WL 2857950, at *5 (N.D. Tex. Apr. 20, 2020) (finding the petition was untimely after petitioner failed to provide sufficient facts to show when he was first on notice of the factual predicate, recently received

witness statements); *Toney v. Quarterman*, 2009 WL 2356104, at *7 (S.D. Tex. July 27, 2009) ("[m]erely alleging new evidence to support facts that were known at an earlier date does not suffice to establish a new factual predicate").

Although not raised in her petition, Shelby asserts in her response that she is entitled to equitable tolling of the limitations period. Doc. [26], at 48. She argues that strict application of the statute of limitations would be inequitable because the medical records were inaccessible to her. *Id*. Respondents argue Shelby is not entitled to equitable tolling because she cannot prove extraordinary circumstances prevented her from timely filing her petition. Doc. [34], at 10. As discussed above, Shelby has not proved that she has been pursuing her rights diligently. Thus, the undersigned finds that Shelby cannot establish that equitable tolling is appropriate. *Holland*, 560 U.S. at 649; *see also Melancon v. Kaylo*, 259 F.3d 401, 408 (5th Cir.2001) (petitioner filing for federal habeas relief four months after Louisiana Supreme Court denied writ was not diligent pursuit of § 2254 relief and therefore equitable tolling was inapplicable); *Covey v. Arkansas River Co.*, 865 F.2d 660, 662 (5th Cir.1989) ("equitable tolling is not available to those who sleep on their rights"); *Wickware v. Thaler*, 404 F. App'x 856, 861 (5th Cir.2010).

b. Actual Innocence

To reach the merits, Shelby asserts a claim of actual innocence. Shelby has the burden of proof "to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find [her] guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006) (citing *Schlup*, 513 U.S. at 329)). It is not enough for Shelby to show "that a reasonable doubt exists in the light of the new evidence." *Schlup*, 513 U.S. at 329. Instead, she must show "that no reasonable juror would have found [her] guilty." *Id.*; *Acker v. Davis*, 693 F. App'x 384, 393 (5th Cir. 2017). In her response to the motion to dismiss, Shelby argues that she has met her

burden because "exposing the State's techniques and testimony as unreliable would have independently precluded a reasonable factfinder from convicting Ms. Shelby." Doc. [26], at 59. She primarily argues that SBS is essentially junk science. Respondents argue that Shelby has failed to meet the actual innocence requirements. Doc. [34], at 19.

   i.   Change in Science

Shelby seeks to proclaim her actual innocence by pointing to Dr. Riddick's and other expert testimony at the PCR hearing. At trial, Dr. Riddick did not question the validity of SBS. In contrast, at the PCR hearing, Dr. Riddick spoke to his discomfort with the theory. Doc. [10-30], at 267. Shelby argues that Dr. Riddick's PCR testimony, explaining the controversy surrounding SBS, coupled with other expert reports can only indicate that the trial testimony was inherently faulty. Doc. [26], at 12. The record does not present such a manifest injustice. *Schlup,* 513 U.S. at 324, 327. Dr. Riddick's PCR testimony merely exhibits his willingness to acknowledge the change in science. Dr. Riddick did not present exculpatory evidence that SBS is completely debunked. He simply presented his own uneasiness with the theory he conceded had long been in controversy. Doc. [10-30], at 258. The controversy surrounding SBS has been widely viewed by courts as simply a battle of the experts. *See Gimenez*, 821 F.3d at 1145 (rejecting petitioner's claim that no reasonable fact-finder would have found him guilty in light of his new evidence questioning SBS, because "[a] jury could still have concluded that [the child] was shaken to death based on her numerous suspicious injuries"), cert. denied, 137 S. Ct. 503 (2016); *Burns*, 2019 WL 3067928, at *5–6 (E.D. Mich. July 12, 2019) (concluding that SBS is not "junk science" but rather a mere controversy within the medical community that was "a question of credibility, a so-called battle of the experts"); *Foster*, 2012 WL 3776471, at *8–9 (concluding that the petitioner had failed to establish actual innocence where he presented several medical experts who disagreed with the state's expert testimony at trial that the child had died from abuse by violent shaking, because a

difference of medical opinion is not enough to show that no reasonable fact-finder would have voted to convict him), aff'd, 587 F. App'x. 356 (9th Cir. 2014); *Bynum v. Premo*, 2020 WL 989608, at *14 (D. Or. Feb. 20, 2020).

Even if the Court were to read Dr. Riddick's testimony as a complete repudiation of SBS, Shelby likely would not be entitled to federal habeas relief on those grounds. *See Wright*, 601 F. App'x at 121 (agreeing with the District Court that the forensic pathologist's expert report and testimony were, "not persuasive evidence of actual innocence because they do not show a paradigm shift in understanding [S]haken [B]aby [S]yndrome that undermines the medical evidence presented at trial"). The undersigned also notes that such a battle of the experts existed at Shelby's PCR hearing. For instance, Shelby presented experts that concluded SBS was no longer a sound diagnosis; while the state presented an expert that testified there was a "general acceptance" of the diagnosis. Doc. [10-30], at 546.

Additionally, the record demonstrates that Dr. Riddick's PCR testimony presents inconsistencies. Dr. Riddick, during his deposition before the hearing, spoke about injuries occurring from a car accident on the way to the hospital. However, at the hearing Dr. Riddick stated, "I was wrong . . . I was mistaken" about the accident occurring at that time. *Id*. at 333. He also noted at the PCR hearing that he changed his position on the lethality of short falls from his deposition to his hearing testimony. *Id*. His changed testimony, which is significantly speculative, cannot be viewed as exculpatory scientific evidence. Doc. [10-30], at 249–63. *See House*, 547 U.S. at 537; *Lutze*, 2008 WL 2397640, at *15. Also concerning, Dr. Riddick acknowledged at the PCR hearing that he changed his opinion and signed his affidavit before reviewing his own trial testimony and records. Doc. 10-30 at 298–308; Doc. [10-30], at 305. Dr. Riddick's inconsistences and willingness to provide an affidavit before reviewing his records give the undersigned pause,

as it did the Mississippi Court of Appeals. *Shelby*, 311 So. 3d at 620. He also explained that the information he received from the Innocence Project played a role in his decision to change his testimony years later. Doc. [10-30], at 257. The undersigned is not as willing to view Dr. Riddick's testimony as the smoking gun to elucidate Shelby's innocence. *See Wright*, 601 F. App'x at 121. Successful gateway claims of actual innocence are "extremely rare," and relief is available only in the "extraordinary case" where there was "manifest injustice." *Schlup,* 513 U.S. at 324, 327.

The undersigned is also keenly aware that the medical records relied upon in the new PCR expert reports have remained unchanged and available since trial. For instance, Shelby explains that Dr. Ophoven's, a forensic pathologist, findings were based on the child's "autopsy and medical records." Doc. [26], at 29. Dr. Mack's, a radiologist, findings were based on CAT-scans taken at the Biloxi Hospital in in 1997. Doc. [30], at 180. Dr. Monson, a biomechanical engineer, according to Shelby "explained why testimony at trial about force and acceleration was wrong" concerning short falls.  Doc. [10-30], at 33. The PCR record demonstrates that there are no new medical reports, only new interpretations. Dr. Ophoven also analyzed Shelby's ability to shake a toddler after giving birth by Caesarean section only weeks prior. *Id*. at 511. Yet, this information is also not new. The undersigned is not persuaded that the PCR experts' testimony and reports constitute "new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial" *Schlup*, 513 U.S. at 324, 327. Instead, these experts simply re-examine the same evidence through the lens of 'changed science.' As discussed earlier, this 'changed science' theory should have been pursued much earlier through the exercise of due diligence.

    ii.    Blunt Force Injuries

Shelby has not persuaded the undersigned that more likely than not, in light of the new evidence, no reasonable juror would find her guilty beyond a reasonable doubt. *See Giminez*, 821

F.3d at 1145; *Howard v. Wolfe*, 199 F. App'x 529, 534 (6th Cir. 2006); *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 427 (6th Cir. 2003); *Wright*, 601 F. App'x at 121; *Bynum*, 2020 WL 989608, at *14; *Stern v. Schriro*, 2016 WL 11431554, at *11 (D. Ariz. Aug. 2, 2016); *Foster*, 2012 WL 3776471, *9 (D. Ore. Mar. 20, 2012).

"Based on [the] total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 329). Shelby fails to account for the total record. In her petition, Shelby argues "[t]he claim that injuries like Little Bryan's can only be caused by violent shaking is now known to be untrue. This now-outdated medical evidence is the only evidence ever presented against Tasha." Doc. [10], at 18. In Shelby's response, she asserts that "because both sides agreed and proposed to the jury that the cause of death could be only one thing: 'Shaken Impact Syndrome.'" Doc. [26], at 18.

However, the record contradicts these assertions. A review of the trial testimony reveals that injuries resulting from blunt force trauma were also presented to the jury. Doc. [15-9], at 121–31; Doc. [15-10], at 53–55. At trial, Dr. Riddick, testified on cross examination that SBS was distinct from blunt force injuries. Doc. [15-9], at 131. He opined, "I think there probably was shaking on this, but I think it was shaking and impact." *Id*. He further testified that the violent shaking coupled with some form of impact led the child to be non-responsive almost immediately. *Id*. at 126. As to the issue of impact, he explained, "the bruise on the back of his head and the bruise on the front of the head indicates that his head impacted something with enough force to tear the bridging veins . . ." *Id*. at 124. Later, he was asked, "is that what your opinion is in this particular case, that it was shaking and an impact." *Id*. at 132. Dr. Riddick responded, "Yes." *Id*. At the PCR hearing, he confirmed his position that blunt force injuries were separate from SBS. Doc. [10-30], at 337. When asked if he still agreed that blunt force trauma caused the child's injuries, Dr. Riddick

answered, "Yes." *Id*. Further, in its closing arguments, the State asserted, "the injury was by shaking and the impact of hitting the child's head against some immovable object." Doc. [15-10], at 117.

There was considerable discussion at trial concerning the child's bruises. Dr. Max Odom, the treating emergency room physician who notified Social Services, testified at trial that the child had bruises on his head and armpits from three to five days old and a "significant brain injury from blunt trauma." Doc. [15-8], at 123–24. He has not recanted his testimony. Dr. Riddick further discussed the extensive, recent bruising on the child at trial:

> [and] he had a quarter-inch bruise on his left forehead. He had a three-eighth of an inch bruise on the outer portion of the right side of his face in this region. Another one-eighth inch of a bruise on the outer portion of his eyebrow. Had a bruise on his right cheek that was about an inch and a quarter in greatest dimension. And then he had on his back, as I point to myself, on the back of his left shoulder blade, he had a quarter-inch blue bruise, and he had another one in the midline on his lumbar region, and he had another bruise on the outer portion of his left thigh.

Doc. [15-9], at 151. Thus, the trial record indicates that SBS was not the sole theory presented at trial. The jury was presented with extensive testimony on blunt force injuries and bruising, beyond solely Dr. Riddick's opinions, and unanimously rendered a guilty verdict. The undersigned also notes that Shelby does not question the soundness of the scientific theories concerning shaking in conjunction with impact among the medical community. So, Shelby has not properly accounted for the blunt force trauma testimony at trial. *See Lutze v. Sherry*, 2008 WL 2397640, at *15 (E.D. Mich. June 11, 2008), aff'd, 392 F. App'x 455 (6th Cir. 2010).

### iii. Alternative Theories

To establish actual innocence, Shelby presents alternative, accidental scenarios that she argues explain the child's fatal injuries. As support, she points to Dr. Riddick's PCR testimony where he explored those theories and suggested the cause of death was an accident. The undersigned has reviewed and compared Dr. Riddick's trial testimony with his PCR testimony. Doc. [10-30], at

244–376. *Shelby v. State*, 311 So. 3d 613, 620 (Miss. Ct. App. 2020) (concluding "[t]hus, in substance, the testimony at the PCR hearing on this issue was similar to the testimony at trial").

Even if the Court were to read the testimony as a complete repudiation, Shelby still cannot meet the clear and convincing standard. *Nobles v. Johnson*, 127 F.3d 409, 423 n. 33 (5th Cir. 1997). *See* 28 U.S.C. § 2254(e)(2)(B). When providing his new opinion, Dr. Riddick merely offers credence to Shelby's alternative theories on the child's cause of death. These theories include: an injury to the child's head when he was being rushed to the hospital, a seizure disorder, and the possibility that a short fall resulted in death. Doc. [10-30], at 256–63. Although Shelby points to Dr. Riddick's nod of approval to these potential theories, all three possible causes of death were discussed at trial.[1] This is fatal to her actual innocence claim.

A review of Dr. Riddick's PCR testimony demonstrates that he simply embraced and elaborated upon Shelby's alternative theories. Doc. [10-30], at 225–26. The undersigned does not believe Dr. Riddick's discussion of the various theories rises to the level of clear and convincing evidence. "To be credible, [an actual innocence] claim requires [the applicant] to support her allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Tyler v. Davis*, 768 F. App'x 264, 265 (5th Cir. 2019) (quoting *Schlup*, 513 U.S. at 324 (1995). Shelby presents no such evidence.

To establish her innocence, Shelby suggests the child's injuries resulted from a bump on his head on the way to the hospital. However, this exact theory was explored at trial. The child's father testified that he was responsible for bumping the child's head slightly on the car door when rushing to the hospital. He stated that the child did not suffer his severe injuries from that incident. Doc.

---

[1] To the extent that Shelby argues emergency procedures caused the child's blunt force injuries, based on Dr. Riddick's PCR testimony, this theory was explored at trial. Doc. [26], at 41; Doc. [15-9], at 128.

[15-9], at 48–49. Dr. Riddick also testified at trial, "the injuries that caused the death were not caused by his hitting a van door on the way to the hospital, no." Doc. [15-9], at 128. Thus, the undersigned does not find the disputed head injury theory to be new evidence.

Similarly, Dr. Riddick explored and endorsed another of Shelby's theories when he testified at the PCR hearing about the plausibility of a seizure disorder. He speculated that the seizure disorder was a "better explanation for the swelling of the brain than from some form of intentional abuse." Doc. [10-3], at 257. Yet, Dr. Riddick clarified that there was no diagnosis or documentation by a physician accounting for a history of seizures. Doc. [10-30], at 305–310, 354, and 268. Shelby does not present any new documentation indicating the child had a history of seizures. A review of the record indicates that a possible family history of seizures was discussed and disputed at trial. Doc. [15-10]. For example, the child's father testified that there was not a history of seizures in the family. Doc. [15-10], at 17. The prosecutor also noted that the pediatrician's file made no mention of a history of seizures. Doc. [15-10], at 60. Accordingly, jurors were not only presented with the seizure theory, but also heard facts to discredit the theory. Like the Mississippi Court of Appeals concluded, the undersigned does not find this speculative theory to be any sort of new evidence. Doc. [1-37], at 21. Doc. [30], at 313.

Lastly, Shelby seeks to explain the child's death by claiming he died from a short fall. Shelby highlights Dr. Riddick's PCR testimony contemplating the possibility that a short fall caused the child's death. To explain blunt force injuries, Dr. Riddick reasoned, "[w]hether it was standing up and fell backwards or whatever, we don't know, but he hit the back of his head and that [sic] could cause the bruise on the back of his scalp." Doc. [10-30], at 261. He elaborated by stating, "Indeed

16

those people who studied it says [sic] that it only happens once in a million. Well, this case was, in a way, once in a million." Doc. [10-30], at 259.[2]

But, this theory was discussed at length at trial; and jurors heard facts undermining the theory. Dr. Anthony Ioppolo, a neurosurgeon and Shelby's expert at trial, testified that a fall from his bed was "the less likely cause" based on his opinion and the scientific literature. Doc. [15-10], at 56. Also, Dr. Max Odom was asked if the child's injury could have been caused by falling off a bed sixteen to eighteen inches off the floor. Dr. Odom responded, "I have never seen those injuries in a child who's fallen off a bed in all my years of practice that was 16 inches from the floor." Doc. [15-8], at 127. Neither Dr. Odom nor Dr. Ioppolo has recanted any of their trial testimony or medical observations. As part of the discussion concerning a potential fall, there was also extensive testimony about the floor's carpeting. The jury heard testimony from an investigator that the floor was "shag carpeted and padded." Doc. [15-9], at 82. The investigator stated, "In my opinion, it was padded carpet. The floor was soft." *Id*. at 103. Later, the prosecutor asked Dr. Riddick, "Could a fall of this child . . . off of a bed that was 16 inches off the floor onto a carpeted floor, could that fall have caused all the contusions to his head?" Dr. Riddick answered, "No." *Id*. at 124.

Defense counsel explored the viability of a short fall theory at trial and extensively cross-examined Dr. Riddick on that exact issue. The cross-examination led to additional discussion during redirect by the prosecutor. Doc. [15-9], at 147–51; Doc. [15-10], at 2–4. Dr. Riddick also testified to the scientific literature surrounding short falls. Doc. [15-9], at 143. Although Shelby's PCR expert, Dr. Monson, opined that short falls could have caused the child's fatal injuries, that

---

[2] However, Dr. Riddick seemingly tempered that position later at the hearing. On cross-examination, the State noted that Shelby asserted she heard a "thump" prompting her to check on the child. When asked, "[and] would you agree that a fall from a bed with a thump would not cause all the trauma and injuries that you see in this child?" Dr. Riddick replied, "No." Doc. [30], at 353. He further explained that he had not seen a lethal injury involving a fall from less than ten feet. *Id*.

later testimony cannot overcome the fact that the theory was explored at trial. Further, Dr. Monson testified at the PCR hearing that the biomechanical community had long endorsed the belief that short falls could cause serious harm. Doc. [10-30], at 110. So, Shelby's alternative theory based on the lethality of short falls cannot be viewed as new evidence.

Most importantly, Shelby does not submit any new scientific evidence demonstrating that the child's death was something of a one-in-a-million type. The theory and Dr. Riddick's discussion of the theory cannot be viewed as new reliable evidence. The trial testimony on this issue was extensive and Shelby has not shown that no reasonable juror would find her guilty beyond a reasonable doubt.

Considering that standard, the jury also heard testimony that presented difficulties for Shelby. The jury heard damaging facts related to Shelby's possible frustration with the child victim. For example, Shelby's grandmother testified that Shelby "said that she felt like she was dealing with a retarded child because he was very slow and didn't know back from front. . . and he still wasn't potty trained and stuff." Doc. [15-9], at 60. An investigator testified that Shelby was not crying and "didn't seem concerned" when he interviewed her shortly after she arrived at the hospital. Doc. [15-9], at 73. The jury also heard testimony that Shelby did not call 911. Despite having her own vehicle, she waited for the child's father to come home before driving to the hospital. *Id*. at 20. The child's father and Shelby's grandmother testified that they did not notice visible injuries on the child earlier in the evening of the child's death. *Id*. at 42 and 55. Shelby's grandmother testified that the child was in good health and playing when she saw him. Doc. *Id*. at 55. It was undisputed that Shelby was the only adult with the child when he suffered his fatal injuries.

c.   Evidentiary Hearing

Shelby requests an evidentiary hearing on the issues raised in the motion to dismiss. Doc. [26]. An evidentiary hearing may be ordered in federal court on habeas review only when the applicant

fails to develop the factual record in state court. *See* 28 U.S.C. § 2254(e)(2). Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is required only when the petitioner demonstrates that his claim relies on a new, retroactive rule of constitutional law that was previously unavailable, or that it relies on a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2). The Fifth Circuit has "repeatedly found that a paper hearing is sufficient to afford a petitioner a full and fair hearing on the factual issues underlying his claims, especially where . . . [as here] the trial court and the state habeas court were one and the same." *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir.2000) (citing *Perillo v. Johnson*, 79 F.3d 441, 446–47 (5th Cir.1996)).[3]

Shelby requests an evidentiary hearing "based on all the evidence . . . without regard to whether it would necessarily be admitted under rules of admissibility." Doc. [26], at 4. Shelby was granted a lengthy evidentiary hearing in the state courts, which afforded her a full opportunity to develop her allegations through the aid of counsel. Doc. [10-30]. She presented four experts at the hearing and previously participated in depositions. A substantial factual record already exists on all her claims.

The undersigned finds that Shelby has not shown that the factual record was not sufficiently developed in state court. She has not presented a claim based on a new and retroactive

---

[3] Even if the requisite factual development did occur, Shelby is not automatically entitled to the requested hearing: "[O]vercoming the narrow restrictions of § 2254(e)(2) does not guarantee a petitioner an evidentiary hearing, it merely opens the door for one; once a petitioner overcomes the obstacles of § 2254(e)(2), ... the district court retains discretion over the decision to grant an evidentiary hearing." *Murphy v. Johnson*, 205 F.3d at 815; *see also Riddle v. Cockrell*, 288 F.3d 713, 720 (5th Cir. 2002) ("[E]ven after an individual meets the standard set forth in § 2254(e), a district court's denial of an evidentiary hearing is reviewed for an abuse of discretion."). A petitioner is "entitled to an evidentiary hearing only where a factual dispute, if resolved in [her] favor, would entitle [her] to relief, and not where [the] allegations are merely conclusory allegations unsupported by specifics." *Murphy*, 205 F.3d at 816; *see also Shields v. Dretke*, 122 F. App'x. 133, 156 (5th Cir. 2005).

rule of constitutional law that would impact her claims. She has not presented any fact that could not have been previously discovered. She has not alleged facts that would show that no reasonable factfinder could find her guilty. Thus, Shelby is not entitled to an evidentiary hearing. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing"); *Elliott v. Johnson*, 2001 WL 674186, at *6 (W.D. Tex. Mar. 1, 2001).

d.   Conclusion

Based on the total record, the undersigned is not persuaded that Shelby has met her burden of proof that more likely than not, in light of the new evidence, no reasonable juror would find her guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 329. Successful gateway claims of actual innocence are "extremely rare," and relief is available only in the "extraordinary case" where there was "manifest injustice." *Id*. at 324, 327. Shelby has not persuaded the undersigned that there has been manifest injustice. Even if the Court were to read Dr. Riddick's PCR testimony as a full recantation, Shelby has not overcome the ample testimony and evidence indicating blunt force injuries. She has not come forth with exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence. The actual innocence exception's demanding standard requires "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." *McQuiggin*, 569 U.S. at 401 (quoting *Schlup*, 513 U.S. at 316). The Fifth Circuit has noted that "the standard is seldom met." *Floyd v. Vannoy*, 894 F.3d 143, 154–55 (5th Cir. 2018) (citing *Schlup,* 513 U.S. at 327). Based on the totality of the record, which includes detailed discussion at trial on blunt force injuries and the proposed alternative theories, the undersigned is not persuaded that Shelby has presented evidence so strong that the Court cannot have confidence in the outcome of the trial.

## RECOMMENDATION

The undersigned recommends that Respondent's motion to dismiss Petitioner Tasha Shelby's Writ of Habeas Corpus be granted. Doc. [16]. The undersigned recommends that Shelby's petition be dismissed for a lack of timeliness and a failure to establish actual innocence.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Court.  A party filing objections must specifically identify those findings, conclusions and recommendations to which objections are being made; the District Court need not consider frivolous, conclusive, or general objections.  Such party shall file the objections with the Clerk of the Court and serve the objections on the District Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions and recommendation contained in this report shall bar that party from a de novo determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions that have been accepted by the district court and for which there is no written objection. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

SO ORDERED AND ADJUDGED, this the 7th day of February 2023.

/s/ *Robert P. Myers, Jr.*
ROBERT P. MYERS, JR.
UNITED STATES MAGISTRATE JUDGE